NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**TOYO TIRE CORP., TOYO TIRE U.S.A. CORP.,**
*Plaintiffs-Appellants*

**v.**

**ATTURO TIRE CORPORATION,**
*Defendant-Cross-Appellant*

**SVIZZ-ONE CORPORATION LTD.,**
*Defendant-Appellee*

---

2022-1817, 2022-1892

---

Appeals from the United States District Court for the Northern District of Illinois in No. 1:14-cv-00206, Judge Mary M. Rowland.

---

Decided: October 4, 2024

---

JOHN CUSTER, MATTHEW B. LOWRIE, Foley & Lardner LLP, Boston, MA, argued for plaintiffs-appellants. Also represented by KIMBERLY KRISTIN DODD, Milwaukee, WI.

DEANNE MAYNARD, Morrison & Foerster LLP, Washington, DC, argued for defendants. Also represented by JOEL DAVID BERTOCCHI, BRIAN BIANCO, JULIA RENEE

LISSNER, Akerman LLP, Chicago, IL; KRISTEN M. FIORE, Tallahassee, FL. Defendant-cross-appellant also represented by ALEXANDRA M. AVVOCATO, Morrison & Foerster LLP, New York, NY.

———————————

Before MOORE, *Chief Judge*, CLEVENGER and CHEN, *Circuit Judges*.

CHEN, *Circuit Judge*.

Toyo Tire Corp. and Toyo Tire U.S.A. Corp. (collectively, Toyo) sued Atturo Tire Corporation (Atturo) and Svizz-One Corporation Ltd. (Svizz-One) in the United States District Court for the Northern District of Illinois for federal trade dress infringement, among other claims. Toyo principally alleged that Atturo's Trail Blade Mud Tire (TBMT) infringed Toyo's unregistered trade dress on its Open Country Mud Tire (OPMT).[1] Atturo counterclaimed for federal trademark liability for false designation of origin under section 43(a)(1)(B) of the Lanham Act, and also brought several state law counterclaims: (1) tortious interference with contract, (2) tortious interference with prospective business expectancy, (3) unjust enrichment, (4) unfair competition, (5) defamation, and (6) liability under the Illinois Deceptive Trade Practices Act (IDTPA).

At the summary judgment stage, the district court sanctioned Toyo for discovery misconduct because Toyo never adequately identified its asserted trade dress during fact discovery, and the district court also excluded Toyo's expert testimony for relying on the wrong trade dress. The district court then granted summary judgment that Toyo

———————————

[1] The parties and the district court referred to the Open Country Mud Tire as OPMT or OPMT tire, so we will do the same.

lacked a valid trade dress because its purported trade dress was functional and lacked secondary meaning.

Atturo's counterclaims proceeded to a jury trial, and Toyo argued it could not be liable under three privilege doctrines: (1) Illinois intellectual property privilege, (2) Illinois absolute litigation privilege, and (3) *Noerr-Pennington* immunity. The jury returned a liability verdict on six of Atturo's counterclaims, awarding $10 million in compensatory damages and $100 million in punitive damages.

After trial, the district court set aside the jury's liability verdict for three claims and sustained the jury's verdict for the other three. Specifically, it rejected Atturo's claim for tortious interference with contract—which is not appealed—as well as Atturo's defamation and IDTPA claims, concluding those two claims were barred by Illinois's absolute litigation privilege. But it sustained the three remaining claims on which Atturo prevailed as not barred by any privilege doctrine. It entered judgment in Atturo's favor on those surviving claims—tortious interference,[2] unfair competition, and unjust enrichment—and reduced the jury's punitive damages award.

Toyo appeals, and Atturo cross-appeals. For the following reasons, we *affirm-in-part*, *reverse-in-part*, and *dismiss-in-part*. We affirm the district court's imposition of discovery sanctions, exclusion of certain expert testimony, and grant of summary judgment that Toyo lacks a valid trade dress. But we agree with Toyo that the district court erred in declining to apply the absolute litigation privilege to bar the tortious interference, unfair competition, and unjust enrichment counterclaims, and we thus reverse the

---

[2]    In this opinion, we use the term "tortious interference" to refer to tortious interference with prospective business expectancy as opposed to tortious interference with contract.

district court's judgment as to those claims. Finally, we reject Atturo's cross-appeal as to its defamation and IDTPA claims, and we do not reach Atturo's punitive damages arguments because they are rendered moot by our reversal of the underlying liability judgment.

## I.

## A.

Toyo is an international company whose business includes the design and manufacture of tires. Below is an annotated illustration of Toyo's OPMT tire tread that embodies Toyo's alleged trade dress.



Appellant's Br. 19.

In Toyo's OPMT, each element of the tread impacts the tire's traction, performance, self-cleaning ability, or a combination of those features. *Toyo Tire Corp. v. Atturo Tire Corp.*, No. 14-cv-00206, 2021 WL 463254, at *3–4 (N.D. Ill. Feb. 9, 2021) (*Summary Judgment Decision*). For example, the "tread blocks" are shaped and positioned to provide traction either off-road or on pavement. *See id.* at *3. Each block also has internal "sipes" that allow the tread block to flex, which further improves the tire's traction, and the outer blocks include "scallops," a shaved edge point that

bites into the ground and helps eject mud, snow, and rocks to maintain traction. *Id.* at *3–4. Finally, the "stone ejectors" help push out debris in various environments. *Id.* at *4.

Atturo is a designer, marketer, and importer of tires for the United States auto market. In 2012, Atturo hired an outside consultant—Svizz-One, its co-appellee[3]—to design and manufacture a new tire. Atturo's resulting tire, which it called the Trail Blade M/T (TBMT), is depicted below:




Toyo Open Country M/T          Atturo Trail Blade M/T

J.A. 20268.

---

[3] Svizz-One operated under the name Deestone at that time. We refer to both entities as Svizz-One.

B.

Perceiving widespread copying of its tires, Toyo initiated a series of cases in federal district courts and in the United States International Trade Commission (ITC). Because the ITC litigation forms the basis for Atturo's counterclaims, we briefly describe it before turning to the district court case underlying this appeal.

1.

Toyo petitioned the ITC to investigate allegations of design patent infringement against more than twenty manufacturers and distributors of various tires, but Toyo did not pursue an ITC investigation against Atturo. In September 2013, the ITC instituted the requested investigation, and Toyo settled many of these ITC cases. *See, e.g.*, J.A. 22403–04; J.A. 22409–10.

As part of the settlement agreements, each respondent agreed to a cease-and-desist provision to stop selling the tires accused in the ITC investigation. *See, e.g.*, J.A. 21897. But in the agreements, Toyo also identified "additional tires that it believe[d] infringe other Toyo intellectual property not asserted in the ITC Action." J.A. 21895, 21897, 21912. Rather than filing further litigation, Toyo asked the settling respondents to also cease and desist with respect to those additional tires. Most respondents agreed to cease and desist selling these additional tires, which included Atturo's TBMT. *See, e.g.*, J.A. 21895, 21897, 21912.

One respondent—Svizz-One—agreed with that general approach. J.A. 22057–70. But Svizz-One's settlement agreement "explicitly excluded" Atturo's TBMT from the cease-and-desist agreement. *Id.* at 22058–60, 22070.

Before terminating an investigation based on a settlement, the ITC requires the parties to file a motion containing copies of settlement agreements with redactions covering confidential business information. *See* 19 C.F.R. § 210.21(b)(1). Following Toyo's motion to terminate the

settling respondents from the ITC investigation, Atturo mailed to the Acting Secretary of the ITC a letter "express[ing] concern" about the settlement agreements and urging the ITC to review those agreements to ensure they do not unduly restrain competition in the United States tire market and to forward the agreements "to appropriate agencies, including the United States Department of Justice, and the Federal Trade Commission." J.A. 23213–20. Nevertheless, the ITC terminated the investigation due to the settlements. *See, e.g.*, J.A. 22280–82; J.A. 22403–05.

2.

In January 2014, Toyo filed the district court litigation giving rise to this appeal, asserting design patent infringement, trade dress infringement, and other claims not relevant on appeal. Toyo eventually dismissed its design patent claims with prejudice and proceeded with its trade dress claim.

In its complaint, Toyo identified its alleged trade dress as "the overall appearance" of its OPMT tires. J.A. 1326. During discovery, Atturo served an interrogatory asking Toyo to identify precisely what elements of the tire were included in the trade dress. *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14-cv-00206, 2018 WL 3533315, at *1 (N.D. Ill. July 23, 2018) (*Sanctions Decision*). In its first response, Toyo indicated that the trade dress "*may*" include both a variety of tread features and their physical orientation relative to one another. *Id.* (citation omitted). But Toyo's response expressly disclaimed being limited to the features identified in its response because it also noted that the "trade dress may be articulated using different words." *Id.* (emphasis omitted) (citation omitted). The district court found that this response "seemed to confuse, rather than clarify, matters." *Id.*

Atturo subsequently moved to compel a more specific answer, and the district court agreed that was appropriate. The court instructed Toyo to respond "fully" and "without

qualification" because—nearly a year into the case—Toyo had still not answered "what it is [Toyo is] claiming is [the] protectable intellectual property right here." *Id.* at *1–2 (citations omitted). The district court also warned Toyo that it would be "stuck" with its revised answer to the interrogatory. *Id.* at *2 (citation omitted).

Toyo responded by "summarizing the OPMT trade dress as 'the "OPMT look," i.e., the overall visual appearance and impression conveyed by the Open Country M/T tire tread design,'" and providing images that highlighted what aspects of the OPMT were included in the trade dress. *Id.* (emphasis omitted) (citation omitted). Those highlighted images are reproduced below:



J.A. 9247.  The blue highlighting includes both two-dimensional features and three-dimensional features.  For example, Image C highlights the OPMT's three-dimensional "scallops."  *Sanctions Decision*, 2018 WL 3533315, at *6 n.5.

Seven months later, Atturo deposed Toyo's Rule 30(b)(6) witness, and her testimony was inconsistent with Toyo's identified trade dress.  She testified that the "tread design" included "grooves" (the spaces between blocks), "stone ejectors" (small rubber raised features within the grooves), and "sipes" (the thin, shallow indentation within each tread block).  *Id.* at *2 & n.2 (citations omitted).  None of these features are highlighted in Toyo's blue-highlighted images.  She also testified that "the siping 'is a differentiator'" that "makes the tires recognizable as OPMT tires."  *Id.* at *2 (citations omitted).

At Atturo's request, the district court granted two more motions to compel because Toyo had "refused to state unequivocally whether certain tires contain trade dress features and what those features are."  *Id.* at *3 (cleaned up).  The court also ordered Toyo to produce a corporate witness who could "identify which specific features on the tires meet the definition of trade dress and which do not."  *Id.* (citation omitted).

Toyo's corporate witness declined to comply with the court's order.  Instead, on the advice of counsel, the witness refused to answer "more than one hundred different questions" addressing whether any specific features of the OPMT tire were part of the asserted trade dress.  *Id.* at *4 (citation omitted).  The witness also declined to answer "whether specific images of various Toyo tire models displayed the trade dress, despite being a [Rule] 30(b)(6) witness."  *Id.*

One month before the end of fact discovery, the district court again ordered Toyo to "produce a [Rule] 30(b)(6) witness to answer questions regarding which tread patterns

are embodied in its asserted trade dress." *Id.* (citation omitted). Toyo's final corporate witness indicated that the sipes were indeed part of Toyo's trade dress. *Id.* This testimony is inconsistent with Toyo's interrogatory responses, including the blue-highlighted images, which did not highlight the sipes. Fact discovery then closed. *Id.*

Toyo later served its expert reports, expressing for the first time that Toyo's expert witnesses defined Toyo's trade dress as a "two-dimensional" trade dress—exclusively limited to the outer surfaces of the tire tread that physically touch the road during ordinary driving. *See, e.g.*, *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14-cv-00206, 2019 WL 7020654, at *4, *8 (N.D. Ill. Dec. 20, 2019) (*Daubert Decision*) (quoting reports of Toyo's secondary meaning and functionality experts). Subsequently, Toyo's counsel confirmed that "it would assert as the trade dress only the '2D surface configuration of the center and shoulder blocks.'" *Sanctions Decision*, 2018 WL 3533315, at *4.

Toyo's experts relied on this definition to support a key element of its trade dress validity argument—non-functionality. It is a "well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). To show non-functionality, Toyo's expert noted that its trade dress was limited to "the two-dimensional surface of the tire . . . as opposed to the three-dimensional shapes of the blocks," the latter of which "provide[s] a utilitarian advantage to the tire." J.A. 10146.

On Atturo's motion for sanctions, the district court found that Toyo had improperly and untimely shifted positions between fact and expert discovery. *Sanctions Decision*, 2018 WL 3533315, at *8. Because of this last-minute shift, and Toyo's prior inconsistent deposition testimony, the district court granted Atturo's motion and barred Toyo from asserting a trade dress "limited to the two-dimensional surface layer of the tire's center and shoulder

blocks." *Id.* at \*5. The court found that allowing Toyo to assert the two-dimensional trade dress at this point in the litigation "would effectively allow 'trial by ambush.'" *Id.* at \*9 (citation omitted).

Atturo also challenged Toyo's functionality and secondary-meaning expert witnesses as improperly applying a trade dress not disclosed during fact discovery. The district court agreed, finding that Toyo's experts premised their opinions on the "two-dimensional surface" as the asserted trade dress. *Daubert Decision*, 2019 WL 7020654, at \*3–9. The district court excluded Toyo's expert testimony because allowing expert testimony about the wrong trade dress would circumvent the sanctions order and could confuse the jury. *Id.*

The district court then granted summary judgment that Toyo's asserted trade dress was invalid on two independent grounds: functionality and lack of secondary meaning. *Summary Judgment Decision*, 2021 WL 463254, at \*10. The court explained the trade dress was functional because the design affected the tire's performance, traction, and ability to self-clean when dealing with debris, mud, or snow. *Id.* at \*3–8.

Because Toyo had no remaining claims, the case proceeded to trial exclusively on Atturo's counterclaims, which all relied on overlapping factual assertions that Toyo had wrongfully interfered with Atturo's business by falsely labeling the TBMT as infringing the OPMT trade dress in the ITC settlement agreements. The jury rejected Atturo's counterclaim under the Lanham Act but otherwise found in favor of Atturo on its six state-law counterclaims. The jury awarded a lump sum of $10 million for all claims and a punitive damages award of $100 million.

Following post-trial motions, the district court set aside the jury verdict of liability for three of Atturo's counterclaims. *See Atturo Tire Corp. v. Toyo Tire Corp.*, No. 14-cv-00206, 2022 WL 1470362, at \*12 (N.D. Ill. May 10, 2022)

(*Post-Trial Decision*). First, the district court held that At-
turo's tortious interference with contract claim was sub-
stantively unsupported under Illinois law, a point Atturo
does not appeal. *Id.* at \*8. Second, the district court con-
cluded that Atturo's defamation and IDTPA claims were
barred under Illinois's absolute litigation privilege. *Id.* at
\*3. Third, the district court found a lack of conduct war-
ranting punitive damages and reduced the jury's punitive
damages award to $100,000. *Id.* at \*11.

Toyo appeals, and Atturo cross-appeals. We have ju-
risdiction under 28 U.S.C. § 1295(a)(1). *See Zenith Elecs.
Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1346 (Fed. Cir. 1999)
("Our exclusive jurisdiction over matters arising in whole
or in part under the patent laws is not defeated by the fact
that the patent claims have been dismissed with preju-
dice.").

II.

A.

Toyo first challenges the district court's imposition of
discovery sanctions that barred Toyo from relying on a two-
dimensional trade dress. In the district court's view, Toyo's
assertion of a two-dimensional trade dress during expert
discovery was untimely and violated the court's discovery
rules and orders. We review discovery sanctions under the
law of the regional circuit. *Adasa Inc. v. Avery Dennison
Corp.,* 55 F.4th 900, 916 (Fed. Cir. 2022), *cert. denied,* 143
S. Ct. 2561 (2023). The Seventh Circuit reviews discovery
sanctions for abuse of discretion and underlying factual
findings for clear error. *Dotson v. Bravo,* 321 F.3d 663,
666–67 (7th Cir. 2003).

When a litigant fails to comply with the disclosure re-
quirements of Federal Rule of Civil Procedure 26(a) or (e),
"the sanction of exclusion [of the untimely disclosed infor-
mation] is automatic and mandatory unless the sanctioned
party can show that its violation . . . was either justified or

harmless." *Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998); *see also* Fed. R. Civ. P. 37(c)(1). Whether a "violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996). "[T]he following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Toyo argues that the district court clearly erred in finding that its interrogatory responses did not disclose a two-dimensional trade dress. According to Toyo, the only reasonable way to understand the blue-highlighted images is that they delineate Toyo's two-dimensional trade dress. We reject this argument.

Unlike in its expert reports, Toyo never specified that it relied on a two-dimensional trade dress during fact discovery. When the district court repeatedly ordered Toyo to identify elements of the OPMT tire that were excluded from its trade dress, Toyo's discovery responses declined to do so. Despite multiple depositions, interrogatory responses, and motions to compel, Toyo never stated during fact discovery that its trade dress was limited to a two-dimensional appearance.[4]

---

[4] We are mindful that parties can, and often do, flesh out theories with additional detail during expert discovery. *Salgado*, 150 F.3d at 742 n.6 ("It is expected that the reports will be far more complete and detailed than the practice in responding to interrogatories . . . ." (citation

To the contrary, Toyo's discovery responses conveyed that its trade dress included three-dimensional components. For example, when Toyo disclosed its blue-highlighted images, Toyo's highlighting in Image C included the "scallops," a three-dimensional feature of the OPMT tire. J.A. 9247. Toyo's accompanying written response to the blue-highlighted images also emphasized that the trade dress included both "center blocks and shoulder blocks"—which are also three-dimensional elements of the tire—as well as their physical orientation relative to one another. J.A. 9246–47.

Toyo's Rule 30(b)(6) witness also testified that the sipes—which are unhighlighted and three-dimensional— were part of the trade dress. *Sanctions Decision*, 2018 WL 3533315, at *4. Toyo's corporate witness made these disclosures *after* Toyo had disclosed the blue-highlighted figures. *Id*. at *2–4. For all these reasons, the district court did not clearly err in finding that Toyo had not limited its trade dress to a two-dimensional surface.

Toyo next argues that the district court clearly erred in finding prejudice from the belated disclosure of a two-dimensional trade dress. The district court primarily found prejudice because Atturo focused its discovery efforts on evaluating the functionality and secondary meaning of the three-dimensional trade dress Toyo disclosed during fact discovery and then was ambushed by the two-dimensional trade dress disclosed for the first time during expert discovery. *Sanctions Decision*, 2018 WL 3533315, at *9. That finding was not clearly erroneous.

Indeed, the district court's decision reasonably reflects how timely disclosure of what exactly comprises the

---

omitted)). Here, Toyo's expert reports did not merely offer additional details but instead presented a materially different definition of Toyo's trade dress.

asserted trade dress is particularly critical when the asserted trade dress is unregistered. "To prevail on a trade dress claim, [the plaintiff] must establish that its trade dress is nonfunctional, that it has acquired secondary meaning, and that a likelihood of confusion exists . . . ." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1015 (7th Cir. 2005). Each of these showings requires knowledge of what the trade dress comprises. If the trade dress is unregistered, a defendant must rely on the plaintiff's representations about the scope of the asserted trade dress, including what components are included or excluded from the trade dress. *See, e.g.*, *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 492 (7th Cir. 2019); *Arlington Specialties, Inc. v. Urb. Aid, Inc.*, 847 F.3d 415, 420 (7th Cir. 2017). When, as here, a plaintiff does not timely convey the precise scope of the asserted trade dress or attempts to change the scope after substantial discovery, a district court may very well find prejudice given that the defendant's theory of the case and case strategy may be affected by the plaintiff's identification of the scope of the unregistered trade dress.

Toyo counters that there can be no prejudice here because Atturo should have been on notice of Toyo's trade dress from positions Toyo took in a different case pending in the United States District Court for the Central District of California. *See Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. 15-cv-00246 (C.D. Cal.) (*CIA Wheel* Case). In that case, Toyo asserted that unrelated tires owned by unrelated third parties infringed Toyo's trade dress.

We reject this argument because Toyo's discovery responses did not incorporate any disclosures made in the *CIA Wheel* Case. Toyo instead claims that Atturo was generally "monitoring the docket" in that case. Appellant's Br. 28 (citing J.A. 3392; J.A. 8959–68). But Toyo had a duty to provide complete and accurate discovery responses in this case. The possibility that Atturo monitored the public

version of the *CIA Wheel* Case docket does not obviate Toyo's discovery obligations in this case.

Toyo's argument is also based on a non sequitur: even if Atturo knew about the trade dress asserted in the *CIA Wheel* Case, it does not follow that there cannot be a finding of prejudice in this case. Toyo never explains why knowledge of a different position taken in a different case against different parties means that there cannot be prejudice in this case, let alone why the district court clearly erred in finding prejudice here.

In short, the district court did not abuse its discretion by imposing discovery sanctions. We therefore affirm the district court's sanctions order barring Toyo from asserting a two-dimensional trade dress.

B.

Toyo next challenges the district court's exclusion of Toyo's expert witness testimony. We review evidentiary rulings under the law of the regional circuit. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1368 (Fed. Cir. 2021). The Seventh Circuit offers limited review of *Daubert* rulings. Once the district court has applied *Daubert*, the Seventh Circuit reviews the "ultimate decision 'to exclude or admit the expert witness testimony for an abuse of discretion only.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017) (quoting *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017)).

"Under *Daubert*, the district court is to perform a gatekeeping function and conduct a two-step analysis before admitting expert scientific testimony under Rule 702." *Chapman v. Maytag Corp.*, 297 F.3d 682, 686 (7th Cir. 2002). The court must focus on the validity of the methodology used by the expert and must further determine whether the expert's testimony would assist the finder of fact. *Id.* at 686–87.

Toyo argues that the district court erred in excluding Toyo's expert testimony. We reject this argument because the district court did not abuse its discretion in finding that Toyo's experts relied on the wrong trade dress. The district court also did not abuse its discretion in finding that analyzing a two-dimensional trade dress is not a reliable methodology for assessing a different, three-dimensional trade dress. *See* Fed. R. Evid. 702. Nor did the district court abuse its discretion in finding that the expert testimony independently failed *Daubert* because expert testimony about a two-dimensional trade dress would not assist the jury in assessing a different, three-dimensional trade dress.

Alternatively, Toyo contends that, even if the discovery sanctions were proper, the district court should not have excluded each expert's entire testimony because the two-dimensional tread shapes "dominate the 'overall appearance'" of the OPMT tire. Appellant's Br. 51.

This argument fails because none of Toyo's experts testify to this "dominant components" theory: Toyo's functionality expert understood "the two-dimensional surface of the tire" as the trade dress, and Toyo's secondary meaning experts limited the trade dress to "the surface configuration of the [OPMT] tire tread." J.A. 10146; J.A. 9421; J.A. 9615. These experts then opined about infringement and validity by relying on that two-dimensional trade dress. As the district court observed, Toyo cannot now recast those reports "as providing two different opinions—one about a two-dimensional trade dress and one about a three-dimensional trade dress 'driven by' the two-dimensional surface." *Daubert Decision*, 2019 WL 7020654, at *4.

Accordingly, the district court did not abuse its discretion in excluding Toyo's expert testimony. We therefore affirm the district court on this issue.

C.

Toyo's final trade-dress related challenge is that the district court improperly granted summary judgment that Toyo's asserted, three-dimensional trade dress was invalid. We review a grant of summary judgment under the law of the regional circuit. *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1362 (Fed. Cir. 2022). The Seventh Circuit reviews the grant of summary judgment de novo. *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

The district court found the trade dress invalid because it was both functional and lacked secondary meaning. We address only functionality and affirm the district court's grant of summary judgment on that ground.

"[I]f a product feature is functional, it is not entitled to trade dress protection." *Flexible Steel*, 955 F.3d at 644. "When the trade dress is unregistered (as [Toyo's] is), the party seeking protection has the burden to show it is not functional." *Arlington Specialties, Inc. v. Urb. Aid, Inc.*, 847 F.3d 415, 418 (7th Cir. 2017). "A product feature is considered functional and is ineligible for trademark protection 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Flexible Steel*, 955 F.3d at 644 (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)). Courts generally consider the following factors to determine whether a design is functional:

> (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design

elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost.

*Id.* (quoting *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011)).

The district court correctly granted summary judgment that Toyo's trade dress was functional because there was no genuine dispute that the three-dimensional trade dress affected driving performance. Toyo's own Rule 30(b)(6) witness supported this conclusion, testifying that "'every element of the tread design of the OPMT tire affects the tire's ability to provide traction,' that 'all' of the elements 'work together to provide traction for the OPMT,' and that there are no 'elements of the OPMT tread design that have no effect on the OPMT tire's ability to provide traction.'" *Summary Judgment Decision*, 2021 WL 463254, at \*3 (citation omitted). For example, she testified that the "tread design with hook shape[d] blocks gives superb traction off-road and solid performance on pavement and the open scallop shoulder blocks bite into the ground and help eject mud, snow, and rocks to maintain traction." *Id.* (citation omitted). Toyo's corporate testimony was consistent with "Atturo's unrebutted tire functionality expert" who also testified that "each of the individual elements of the alleged trade dress is utilitarian." *Id.* at \*4 (emphasis omitted).

The district court also pointed out that Toyo's advertising emphasized "superb traction off-road and solid performance on pavement." *Id.* at \*5. It cited testimony from one of Toyo's witnesses that the marketing term used to describe the tread design, "aggressive," describes how Toyo's tires "attack[] . . . whatever surface you're driving on"—a functional benefit. *Id.* at \*6 (citation omitted).

Toyo's arguments fail to identify a genuine dispute of material fact. Toyo primarily argues that summary judgment was inappropriate because Toyo offered evidence of

alternative tire designs.  According to Toyo, these alternative tire designs demonstrate that preventing competitors from copying Toyo's design would not significantly disadvantage them.  But an "asserted trade dress that affects the cost or quality of a product remains 'functional even if other solutions to the design problems are available to competitors.'"  *Flexible Steel*, 955 F.3d at 645 (quoting *Arlington Specialties*, 847 F.3d at 419).  Thus, the existence of alternative tire tread designs does not preclude a grant of summary judgment on this record.

Toyo's other argument—that its advertisements create a fact-issue related to functionality—fares no better.  Toyo acknowledges that its advertisements refer to its tires as having an "aggressive" tread and "attack[ing]" the road.  Toyo interprets these advertisements as referring to the appearance of the tires, not the functionality.  But on their face, Toyo's advertisements uniformly discuss functionality and repeatedly underscore that Toyo's tires achieve performance and traction needs.  Most of Toyo's advertisements of record do not mention "aggressive" or "aggression."  Instead, they tout performance-related benefits:  Toyo's OPMT tires are "specially engineered to provide huge ground clearance, load-carrying capacity and off-road traction."  *Summary Judgment Decision*, 2021 WL 463254, at *6 (citation omitted); *see also id.* ("rock crawling is all about big traction and big clearance . . . our vice-gripping Open Country's [are] perfect for your ascent to the top" (alterations in original) (citation omitted)).  Plus, Toyo adduced no evidence that the phrases "attack" or "aggressive" refer to aesthetics.  To the contrary, Toyo's own witnesses testified that the phrases refer to the OPMT's "all-around traction," thereby improving the OPMT's functional performance.  *Id.* at *6 (citation omitted).

In sum, the district court correctly granted summary judgment because there is no genuine dispute of material fact that the three-dimensional trade dress is functional.

## III.

Toyo's appeal next argues that the district court erred by denying judgment to Toyo on Atturo's three surviving counterclaims—tortious interference, unfair competition, and unjust enrichment—based on the doctrines of intellectual property privilege, absolute litigation privilege, and *Noerr-Pennington* immunity. We agree with Toyo that Illinois's absolute litigation privilege bars these three counterclaims and thus do not reach the intellectual property privilege or *Noerr-Pennington* doctrine. Because Atturo's cross-appeal raises the related issue of whether the district court erred in granting judgment to Toyo based on the absolute litigation privilege for Atturo's defamation and IDTPA counterclaims, we address that portion of Atturo's cross-appeal in this section as well and disagree that the district court so erred. Accordingly, we reverse the district court's judgment as to the tortious interference, unfair competition, and unjust enrichment counterclaims and affirm the district court's judgment as to the defamation and IDTPA counterclaims.

## A.

For issues unrelated to patent law, we apply the law of the regional circuit to which the district court appeal would normally lie—here, the Seventh Circuit. *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001). The Seventh Circuit determines state law issues using the Supreme Court's *Erie* doctrine. *See United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 583 (7th Cir. 2021); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The district court's determination of the content of state law is reviewed de novo. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

Under the *Erie* doctrine, "federal courts try to predict how the state's highest court would rule" on a question of state law. *United Fire*, 7 F.4th at 583. If the issue has been decided "by a decision of 'the State's highest court,' that

decision is 'binding on the federal courts.'" *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 44 (2018) (quoting *Wainwright v. Goode*, 464 U.S. 78, 84 (1983)). If the state's highest court has not addressed the issue, then a court in the Seventh Circuit first looks to state appellate cases and then to other "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" that could indicate "how the highest court in the state would decide the issue." *Pisciotta*, 499 F.3d at 635 (citations omitted).

Though federal courts are empowered to make *Erie* predictions answering unsettled questions, they "must proceed with caution in making pronouncements about state law." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092 (7th Cir. 1999). At the same time, the Seventh Circuit allows a federal court to "extend[] the ruling" of a state court of appeals and apply it to a new context, so long as "the rule's rationale applies" and "its application would be consistent with" other state law principles. *Rsch. Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 925 (7th Cir. 2002).

B.

1.

In Illinois, "[t]he absolute-litigation privilege immunizes certain statements and conduct by attorneys in the course of litigation," as well as by the private parties to litigation. *Doe v. Williams McCarthy, LLP*, 92 N.E.3d 607, 612 (Ill. App. Ct. 2017); *Bushell v. Caterpillar, Inc.*, 683 N.E.2d 1286, 1287–88 (Ill. App. Ct. 1997). "The only requirement for the application of" the absolute litigation privilege is that the communication or conduct "pertain to proposed or pending litigation"—the so-called "pertinency requirement." *Scarpelli v. McDermott Will & Emery LLP*, 117 N.E.3d 238, 246 (Ill. App. Ct. 2018). Whether the absolute litigation privilege applies is a question of law. *Id.* at 245.

In determining the scope of the absolute litigation privilege, Illinois courts generally rely on the Restatement (Second) of Torts (Am. L. Inst. 1977). *Bushell*, 683 N.E.2d at 1288; *O'Callaghan v. Satherlie*, 36 N.E.3d 999, 1007–08 (Ill. App. Ct. 2015). The Restatement (Second) contains parallel provisions applying the absolute litigation privilege to attorneys (section 586) and parties to judicial proceedings (section 587). The provision relevant here, section 587, provides:

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Restatement (Second) of Torts § 587. Although the absolute litigation privilege commonly arises in the context of attorneys, and Illinois courts occasionally speak in terms of the "absolute attorney litigation privilege," *see O'Callaghan*, 36 N.E.3d at 1007, courts generally do not distinguish the scope of the privilege as between attorneys and parties to litigation, *see, e.g.*, *Johnson v. Johnson & Bell, Ltd.*, 7 N.E.3d 52, 56–57 (Ill. App. Ct. 2014) (applying the privilege to a party to litigation and its attorneys); *see also id.* at 56 ("A private litigant enjoys the same privilege [as an attorney] concerning a proceeding to which he is a party." (citing Restatement (Second) of Torts § 587)).

"The defense of absolute privilege rests upon the idea that conduct which otherwise would be actionable is permitted to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff[]." *Bushell*, 683 N.E.2d at 1287. The Restatement (Second) identifies the pursuit of justice

as an interest protected by the absolute litigation privilege. *See* Restatement (Second) of Torts § 587 cmt. a ("The privilege stated in this Section is based upon the public interest in according to all men the utmost freedom of access to the courts of justice for the settlement of their private disputes."); *see also id.* § 586 cmt. a.

Historically, Illinois courts relied on the specific references to defamation and communications in the Restatement (Second) to limit application of the absolute litigation privilege as a defense to only defamation claims based on communications. *See Scarpelli*, 117 N.E.3d at 246–47; *Zdeb v. Baxter Int'l, Inc.*, 697 N.E.2d 425, 430 (Ill. App. Ct. 1998).[5] The provisions of the Restatement (Second) on the absolute litigation privilege, however, have not been adopted by the Illinois Supreme Court, and are thus not binding on Illinois courts. *See O'Callaghan*, 36 N.E.3d at 1009. Over the last decade, Illinois courts have readily and consistently extended the privilege beyond the Restatement (Second) to cover numerous other causes of action, in furtherance of Illinois policy and the purposes of the privilege. *See Johnson*, 7 N.E.3d at 55–57 (negligence, negligent infliction of emotional distress, and breach of contract); *O'Callaghan*, 36 N.E.3d at 1003, 1008–09 (intentional infliction of emotional distress and strict liability for ultrahazardous activity); *Gorman-Dahm v. BMO Harris Bank, N.A.*, 94 N.E.3d 257, 262–264 (Ill. App. Ct. 2018) (abuse of process); *Kim v. State Farm Mut. Auto. Ins. Co.*, 199 N.E.3d 737, 748–49 (Ill. App. Ct. 2021) (common law and statutory fraud); *Doe*, 92 N.E.3d at 612–13 (intentional infliction of emotional distress); *Bedin v. Nw. Mem'l Hosp.*, 187 N.E.3d 739, 749–50 (Ill. App. Ct. 2021) (same);

---

[5]    The Restatement (Second) also applies the absolute litigation privilege to injurious falsehood and invasion of privacy torts. *See* Restatement (Second) of Torts §§ 635, 652F.

*Goodman v. Goodman*, 226 N.E.3d 704, 712 (Ill. App. Ct.) (same), *appeal denied*, 221 N.E.3d 386 (Ill. 2023); *see also Creation Supply, Inc. v. Hahn*, 608 F. Supp. 3d 668, 697–98 (N.D. Ill. 2022) (tortious interference with contract), *aff'd on other grounds sub nom.*, *Creation Supply, Inc. v. Cherrie*, 61 F.4th 511 (7th Cir. 2023).

In particular, the privilege has been applied to bar other causes of action where a party merely "recast[s] . . . a defamation claim in order to avoid the absolute litigation privilege." *Johnson*, 7 N.E.3d at 57. "The absolute [litigation] privilege would be meaningless if a simple recasting of the cause of action could void its effect." *Id.* at 56 (quoting *Barker v. Huang*, 610 A.2d 1341, 1349 (Del. 1992) (cleaned up)). In *Johnson*, for example, the plaintiff brought claims for invasion of privacy, negligence, negligent infliction of emotional distress, and breach of contract, based on the defendants' failure to redact the plaintiff's personal information from publicly filed court documents. *Id.* at 55. Collecting cases from other jurisdictions holding that the absolute litigation privilege can apply to claims that merely recast a cause of action for defamation, the court applied the privilege to bar the plaintiff's claims. *Id.* at 56–57. In that sense, Illinois "policy [is] furthered by disregarding arbitrary distinctions" in the type of claim alleged. *O'Callaghan*, 36 N.E.3d at 1009.

Separately, the absolute litigation privilege has evolved in Illinois case law, "apart and beyond the Restatement (Second), to cover conduct" when that conduct is pertinent to litigation. *Scarpelli*, 117 N.E.3d at 250. As explained in *O'Callaghan*, "[l]imiting the privilege to communications, as opposed to conduct, would undermine the policies behind the privilege. Conversely, the pertinency requirement prevents an attorney from shielding unrelated misconduct from liability." *O'Callaghan*, 36 N.E.3d at 1004, 1009 (holding that the absolute litigation privilege applies to alleged attorney misconduct, including discovery violations and directing condominium inspectors to

perform actions allowing the spread of toxic black mold). For this reason too, Illinois courts have applied the privilege to bar non-defamation-type claims that attempt to impose civil liability on the conduct of attorneys and parties in furtherance of litigation. *See, e.g.*, *id.* at 1009–10; *Scarpelli*, 117 N.E.3d at 249–50; *Goodman*, 226 N.E.3d at 712; *Bedin*, 187 N.E.3d at 749–50.

2.

Toyo argues that the district court erred in declining to apply the absolute litigation privilege to bar Atturo's counterclaims for tortious interference, unfair competition, and unjust enrichment. The Illinois Supreme Court has not addressed whether the absolute litigation privilege can be applied to bar these claims. We must therefore predict how that court would decide this issue. *See Pisciotta*, 499 F.3d at 635. With the above principles and history of the absolute litigation privilege in mind, as well as the multitude of recent, published Illinois Court of Appeals decisions extending the privilege beyond its roots to cover conduct and causes of action other than defamation, we determine that the Illinois Supreme Court would conclude that the "widespread boundaries" of the absolute litigation privilege encompass the causes of action at issue here. *Scarpelli*, 117 N.E.3d at 247; *see Pisciotta*, 499 F.3d at 635.

We believe that the absolute litigation privilege applies because the three counterclaims at issue are merely a recasting of Atturo's counterclaim for defamation and, separately, because Toyo's actions are protectable as conduct pertinent to litigation. Each claim stems from the same common nucleus of fact: Toyo's inclusion of Atturo's TBMT tire in Toyo's ITC settlement agreements. Each claim rests, in part, on the same allegation that Toyo's settlement agreements falsely accused the TBMT tire of trade dress infringement. *See* J.A. 1673–79. Though no published Illinois decision has applied the absolute litigation privilege to the particular torts at issue here, the case law teaches

that Illinois policy—and the privilege's purpose of providing attorneys and parties the "utmost freedom" to secure justice through statements and conduct pertinent to litigation—are furthered by disregarding the "arbitrary distinction[]" of what type of claim is asserted to impose liability based on essentially the same facts as a claim for defamation. *O'Callaghan*, 36 N.E.3d at 1008–09; *see Johnson*, 7 N.E.3d at 56; *Goodman*, 226 N.E.3d at 711; Restatement (Second) of Torts § 587 cmt. a.

The district court disagreed, holding that the three counterclaims at issue do not "merely recast the defamation claim" because they "are not directed only at the allegedly defamatory statements Toyo made; they are based on Toyo's conduct as it relates to Atturo's customer Dunlap & Kyle (D&K) and Toyo's requirement that it never sell, import, or manufacture the Atturo tire." *Post-Trial Decision*, 2022 WL 1470362, at *4. But over the last decade, Illinois courts of appeal have applied the absolute litigation privilege to protect communication and conduct alike and have accordingly extended the absolute litigation privilege to bar causes of action based on conduct. *See Scarpelli*, 117 N.E.3d at 246–48, 250 (discussing the evolution of the absolute litigation privilege). Under that rationale, the absolute litigation privilege may apply to bar the three counterclaims directed to Toyo's conduct even if they do not merely recast the defamation counterclaim. *See, e.g.*, *Goodman*, 226 N.E.3d at 706, 712 (holding that the privilege bars a claim for intentional infliction of emotional distress based on the hiring of private investigators to surveil the plaintiff during divorce proceedings).[6] It would be anomalous to hold that Illinois law permits Toyo to allege trade dress infringement in settlement agreements yet

---

[6]    We note that, last year, the Illinois Supreme Court denied a petition for leave to appeal in *Goodman*. *See* 221 N.E.3d 386 (Ill. 2023).

prohibits Toyo—at the risk of civil tort liability—from including in those same agreements any contractual restrictions to address the alleged infringement. *Cf. Ringier Am., Inc. v. Enviro-Technics, Ltd.*, 673 N.E.2d 444, 445–47 (Ill. App. Ct. 1996) (where the defendant made allegedly false statements in a judicial pleading concerning the plaintiff's title to property, applying the privilege to the defendant's filing and recording of an associated *lis pendens* notice because if "the false allegations in the defendants' counterclaim are protected by an absolute privilege, the associated *lis pendens* enjoys the same protection").

We acknowledge that a single published Illinois Court of Appeals decision has specifically declined to apply the absolute litigation privilege to a claim for tortious interference. *See Zdeb*, 697 N.E.2d at 430. In addition to being over 25 years old and addressing only one of the three types of claims at issue here, we do not find *Zdeb* persuasive. *Zdeb* relied on the facial limitations of the Restatement (Second) without—as more recent Illinois decisions have done—analyzing whether the purposes of the privilege would be served by applying it to a claim that merely recasts the cause of action for defamation. *Id.* Moreover, this point of law is merely dicta in *Zdeb*, which first found that the privilege could not apply because the defendant relied on the incorrect provision of the Restatement (Second). *See id.*; *O'Callaghan*, 36 N.E.3d at 1009 (discounting this point of law from *Zdeb* as dicta).

Two final points support our conclusion that the absolute litigation privilege may apply in this instance. First, although there is no published Illinois Court of Appeals opinion applying the absolute litigation privilege to the three torts at issue here, a recent unpublished opinion applied it to two of them—tortious interference and unjust enrichment—and did not concern the third—unfair competition. *See Eagle Tr. Fund v. Miller*, 2022 IL App (5th)

210156-U, ¶¶ 20, 36, 51.[7]  Second, the Illinois Court of Appeals has applied the related doctrine of absolute privilege for government officials—which, like the absolute litigation privilege, is traditionally a defense to defamation claims—to bar a claim for tortious interference.  *See Geick v. Kay*, 603 N.E.2d 121, 127, 129–30 (Ill. App. Ct. 1992) ("Absolute immunity has been applied to virtually every common-law tort . . . .").

Atturo does not contend that, if we conclude the absolute litigation privilege is applicable to claims for tortious interference, unfair competition, and unjust enrichment, the privilege would not apply in this case for lack of pertinency to litigation.  Regardless, as discussed *infra* with respect to Atturo's defamation and IDTPA counterclaims, we conclude that the challenged statements and conduct by Toyo in settling its intellectual property claims were pertinent to both the ITC proceedings and the district court litigation underlying this appeal.

For these reasons, we reverse the district court's judgment as to Atturo's counterclaims for tortious interference, unfair competition, and unjust enrichment.

C.

We turn next to Atturo's cross-appeal, which argues that the district court erred in concluding Atturo's defamation and IDTPA counterclaims were barred by the absolute litigation privilege.  We disagree.

Atturo does not contest whether the absolute litigation privilege applies to defamation and IDTPA claims.  The

---

[7]    As a case decided after January 1, 2021, *Eagle Trust Fund* "may be cited as persuasive authority pursuant to Illinois Supreme Court Rule 23."  *Kulhanek v. Casper*, 232 N.E.3d 1101, 1108 n.3 (Ill. App. Ct. 2023); *see* Ill. S. Ct. R. 23(e)(1).

sole dispute with respect to these claims is over the pertinency requirement. The absolute litigation privilege applies to communication or conduct that "pertain[s] to proposed or pending litigation," regardless of whether it occurs "before, during, [or] after litigation." *Goodman*, 226 N.E.3d at 711–12 (citations omitted). Illinois "courts have made clear that this [pertinency] requirement is not strictly applied," *Scarpelli*, 117 N.E.3d at 246, and "all doubts are to be resolved in favor of finding" pertinency. *Doe*, 92 N.E.3d at 612.

Here, the allegedly false statements underlying Atturo's counterclaims were made by Toyo in its ITC settlement agreements. Atturo argues that the district court erred in finding that Toyo's trade dress infringement allegations in the settlement agreements are pertinent to either the ITC proceedings or the instant district court litigation.

We agree with the district court on both fronts. Toyo's accusations of trade dress infringement by Atturo's TBMT tire bore "some relationship to" and were "in furtherance of" the ITC proceedings, in which Toyo asserted other intellectual property claims. *Doe*, 92 N.E.3d at 612. Although Atturo was not a party to, and its TBMT tires were not accused in, the ITC action, the trade dress allegations were pertinent to resolving all of Toyo's intellectual property claims against the settling respondents. *See, e.g.*, J.A. 1027–28 (trial testimony that one respondent wanted to "be done and over with . . . [its] involvement" with Toyo). The ITC itself notes that parties, in settling their ITC disputes, may "include provisions, territories, technologies, and details far exceeding the scope of the complaint" filed with the ITC. J.A. 22125.

The trade dress infringement accusations were also clearly in furtherance of and preliminary to the district court litigation. Toyo brought this action against Atturo less than three months after it executed the first of the

settlement agreements, alleging infringement of the same trade dress by the same accused product as alleged in the settlement agreements. Furthermore, Toyo also sued Svizz-One, the sole ITC respondent that *declined* to include the TBMT tire in its settlement agreement. J.A. 22058. "In determining whether the [absolute litigation] privilege should apply," Illinois courts have "considered whether a limitation on the privilege's application would frustrate an attorney's ability to settle or resolve cases without resorting to expensive litigation, as many disputes are best resolved out of court." *O'Callaghan*, 36 N.E.3d at 1008; *see, e.g.*, *Scarpelli*, 117 N.E.3d at 251 (applying the absolute litigation privilege to conduct attempting to bring a matter "to some sort of settlement in an effort to avoid litigation"). Toyo's settlements pertained to, and may have avoided, potential litigation for trade dress infringement against the respondents that accepted inclusion of the TBMT tire.

Finally, Atturo argues that "applying the privilege would leave Atturo no recourse for defamatory statements made during" the ITC proceedings, in which it was not involved. Cross-Appellant's Br. 67. As an initial matter, we note that Atturo did seek a remedy by sending a letter to the ITC requesting that it investigate Toyo's settlement agreements and forward them "to appropriate agencies, including the United States Department of Justice, and the Federal Trade Commission." J.A. 23213–14, 23219. In any event, Atturo's argument is unpersuasive, as Illinois law is "clear that the privilege applies even at the expense of uncompensated harm to a plaintiff." *Scarpelli*, 117 N.E.3d at 251 (rejecting argument that "the litigation privilege should not apply because it leaves [the plaintiffs] with no recourse").

Accordingly, we agree with the district court that Illinois's absolute litigation privilege bars Atturo's defamation and IDTPA counterclaims.

## IV.

We have considered the parties' remaining arguments and find them unpersuasive. Because Atturo does not appeal the judgment in Toyo's favor on Atturo's Lanham Act and tortious interference with contract counterclaims, and we conclude that Atturo's remaining counterclaims are barred by the absolute litigation privilege, we reverse the award of damages to Atturo and dismiss as moot Atturo's cross-appeal as to punitive damages. *See Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 635 (Fed. Cir. 2015) (reversing award of supplemental damages and dismissing as moot cross-appeal on enhanced damages). Therefore, for the reasons explained above, we affirm in part, reverse in part, and dismiss in part.

**AFFIRMED-IN-PART, REVERSED-IN-PART, AND DISMISSED-IN-PART**

Costs

No costs.